HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>        v.<br><br>JERRAMEY LYNDELL ROPER,<br><br>                Defendant. | CASE NO. 3:12-CR-05085-RBL<br><br>ORDER ON DEFENDANT'S MOTIONS<br>[DKTS. #27, 50, 51, AND 52] |

THIS MATTER is before the Court on Defendant Jerramey Roper's Motion to Suppress and Dismiss for Lack of Probable Cause [Dkt. # 50], Motion to Suppress Evidence Seized During Execution of Search Warrants [Dkt. #27], Motion to Dismiss for Lack of Nexus Between the Guns and Drugs [Dkt. #51], and Motion Pursuant to Fed. R. Crim. P. 5 to Suppress Evidence [Dkt. #52]. Roper's Motions are DENIED.

Roper argues that the officers' initial contact and subsequent arrest were not supported by probable cause. Therefore, he claims, any evidence discovered as a result of the unlawful arrest must be suppressed. Roper also asserts that evidence obtained during the execution of three search warrants issued by a Pierce County Superior Court Judge should be suppressed because (1) there was no probable cause for the warrant to search three residences and a motorcycle, and (2) the search of the 56th Street residence exceeded the scope of the warrant. Roper next argues

that Count 5, Possession of Firearms in Furtherance of Drug Trafficking, should be dismissed because the nexus between the guns and the drugs is insufficient to support the charge. Finally, Roper argues that recorded statements from his jail phone calls should be suppressed because the Government violated Fed. R. Crim. P. 5 by keeping him in state custody even though the prosecutor knew federal charges would be filed.

The Government responds that officers had probable cause based on Roper's match to the suspect's physical description, type of vehicle, and unique nickname "Blue." It also argues that Roper lacks standing to challenge two of the searches, probable cause does exist, and even if the warrants are insufficient, suppression is not proper under the good faith exception. And it argues that the nexus is sufficient because one of the weapons was fired during an argument about drugs, and two other firearms were in the defendant's residence near evidence of drug activity. Finally, the Government argues that Rule 5 does not apply because Roper was held in state custody on valid state charges, and no federal interrogation ever took place.

## I.   BACKGROUND

**A. Factual Allegations**

On May 20, 2011, Tacoma police officers responded to a shooting incident in Tacoma, Washington. (M Street Warrant, Dkt. #34, Exh. 2 at 2.) The initial report was that the suspect, a black male in his 30s wearing a white shirt and blue jeans, fired four shots into the air out of a black Honda before fleeing the area. (*Id.*) No one was reported to be hit by the gunshots. (*Id.*) Approximately twenty seconds later, the vehicle description was changed to a black Lincoln with shiny rims. (*Id.*) Officer Blackburn then arrived at the scene of the shooting and contacted Katrina Ross, an eyewitness who lived there. (*Id.*) Ross informed Blackburn that a man who went by the nickname "Blue" fired shots into the air during an argument with her boyfriend, Emmett Black. (*Id.*) After the argument between Black and "Blue" ended, "Blue" got into a

1  black vehicle and left the scene. (*Id.*) Blackburn reported to other officers that the suspect was
2  named "Blue." (*Id.* at 2-3.) Officer Caber knew that the nickname "Blue" was previously
3  associated with Roper, and he recalled a previous case where he made contact with Roper in a
4  black Lincoln. (*Id.* at 2.)

5  Based on this information, Officers Patterson and Caber went to S. 56th Street and Mullen
6  Street in Tacoma, an area Caber knew Roper frequented. (*Id.*) They saw a black Lincoln driving
7  westbound on S. 56th Street and stopped it as it pulled into 4801 S. 56th Street. (*Id.*) Roper
8  exited the passenger seat, and Patterson ordered him down to the ground. (*Id.*) Roper hesitated,
9  looked around, and then sat down. (*Id.*) After being told not to move, Roper grabbed his cell
10 phone, opened the battery compartment, and tore the SIM card in half with his teeth. (*Id.*) Roper
11 and the driver, his girlfriend Shandra Gipson, were then handcuffed and detained. (*Id.*)

12 After being read his Miranda rights, Roper spoke with officers. (*Id.* at 3.) He initially
13 said that he and Gipson were at 3610 S. M Street visiting his grandmother[1] and at 3614 S. M
14 Street visiting his uncle, Lemmone Lewis. (*Id.*) He also said he was renting and living at the
15 4801 S. 56th Street residence. (56th Street Warrant, Dkt. #34, Ehx. 1 at 3.) He declined to
16 consent to searches of the Lincoln or the 4801 S. 56th Street residence. (*Id.*)

17 Three witnesses were brought to the residence. (M Street Warrant at 3.) All three
18 identified the Lincoln as the correct vehicle. (*Id.*) One said Roper was the shooter, and one
19 thought he was the driver. (*Id.*)

20 Officer Blackburn then arrived at the house from the scene of the shooting. (*Id.*) Ross,
21 the eyewitness, had informed him that Roper fired the shots during an argument with Black,
22 Ross' boyfriend. (*Id.*) At this time, Roper changed his story and said that he went over to

---

[1] The Government refers to Ms. Lewis as Roper's grandmother in some documents and as his step-mother in others. For the sake of consistency, the Court uses grandmother in this Order.

ORDER ON DEFENDANT'S MOTIONS
[DKTS. #27, 50, 51, AND 52] - 3

1  Black's residence to fight him over a bad drug deal, but that Black was the one that fired the
2  weapon, not him. (56th Street Warrant at 3.)  Roper was then arrested and transported to the
3  Pierce County Jail. (M Street Warrant at 2.)

4        Officer Patterson spoke with Gipson, the driver. (*Id*.)  She initially said that she and
5  Roper briefly left the house to pick up cigarettes before returning and being confronted by the
6  officers. (*Id*. at 3.)  After Roper's arrest, she changed her story. (*Id*. at 4.)  She indicated she
7  feared Roper, and did not want to tell the truth while he was around. (*Id*. 3-4.)  She said that
8  before they went to Black's, Roper and Black were arguing over the phone about details of a
9  drug deal. (*Id*. at 4.)  After the phone call, Gipson helped Roper put on a bullet proof vest and
10 watched him place an Uzi-style handgun from the 4801 S. 56th Street residence into the
11 Lincoln's trunk. (*Id*.)  Roper told Gipson to drive him to Black's residence so he could "blow
12 somebody's head off." (56th Street Warrant at 3.)  Roper then called his uncle, Lewis, and asked
13 Lewis to grab gloves and a mask from Roper's grandmother's house, the 3610 S. M Street
14 residence. (M Street Warrant at 4.)

15       After picking up the gloves, Gipson drove Roper to Black's house, the site of the
16 shooting. (*Id*.)  During the argument, Roper pulled out the Uzi and fired a few rounds into the
17 air. (*Id*.)  He returned to the vehicle and told Gipson to drive away. (*Id*.)  They went to 3614 S.
18 M Street, where Roper left the gloves and gun at Lewis' residence. (*Id*.)  From there, they drove
19 back toward the 4801 S. 56th Street residence and were met by the responding officers. (*Id*.)

20       Gipson also informed officers that based on her observations that morning she knew
21 Roper had several other guns inside the 56th Street residence, including an AK-47 assault rifle
22 and other pistols, as well as $14,000 worth of cocaine and $10,000 in cash. (56th Street Warrant
23 at 3.)  She said she lives with Roper most of the time and saw him sell cocaine to customers out
24 of the 56th Street residence. (*Id*.)

**B. Warrants**

Based on the information above, officers obtained three search warrants. The "M Street Warrant" authorized the search of 3610 S. M Street (Roper's grandmother's house), 3614 S. M Street (Roper's Uncle Lewis' house), and the black Lincoln. Officers seized ammunition, documents linked to Roper, body armor, a blue uzi pistol case, and two handguns from the 3614 residence. (Mot. to Supp. Evid. Seized, Dkt. #27 at 3). They seized ammunition and documents linked to Roper at the 3610 residence. (*Id.*)

The "56th Street Warrant" authorized the search of 4801 S. 56th Street. At that residence, officers seized a firearm, ammunition, money, a digital scale with white residue, documents addressed to Roper, alprazolam pills, and a pill bottle with Roper's name on it. (*Id.*)

During the execution of the 56th Street Warrant, a police dog alerted to the storage area of a motorcycle in the garage. (*Id.*) Officers observed a plastic bag that appeared to have drugs in it in a locked compartment of the motorcycle. (*Id.*) Because the area was locked, officers requested the "Motorcycle Warrant," which included the same information as the 56th Street Warrant, which was based on the K9's alert and the info in the original 56th Street Warrant affidavit. (*Id.*) The police then seized a baggie of crack cocaine from the motorcycle. (*Id.*)

Later, after the warrants were all executed, Lewis notified officers that he found a bag hidden in his garage. (Consol. Resp., Dkt. #54 at 9). Officers recovered a shotgun and an Uzi, the latter of which was forensically matched to casings found at the scene of the shooting. (*Id.*)

**C. Charging History**

Roper was arrested in his driveway on May 20, 2011, and charged under state law three days later by Deputy Prosecuting Attorney Sabrina Ahrens. (*Id.* at 10.) At some point during the case, DPA Jesse Williams, who also prosecutes federal cases for the Government as a Special Assistant United States Attorney, took over the state case. (Rule 5 Mot., Dkt. #52 at 2.) In

November 2011, Williams wrote to Roper's then-counsel, Jeff Kim, about an offer to plead guilty in federal court and serve 20 years in order to avoid potentially more severe penalties should the case proceed in state court. (*Id.*)

Roper was held in state custody until February 22, 2012. (*Id.*) On that date, the state charges were dismissed, and federal charges were filed. (*Id.*) He had an initial appearance before Magistrate Judge Strombom that same day. (*Id.*) Roper has since filed multiple motions, including those addressed in this Order.

## II.   DISCUSSION

### A. Dkt. #50: Probable Cause for Roper's Initial Detention and Arrest

In his first motion, Roper argues that officers lacked probable cause when they stopped him in the driveway of the 56th Street residence—they had nothing more than a hunch at that point. He argues that officers only knew that the shooter went by "Blue" and was driving a black Lincoln, and an officer claimed to remember his name and address. He argues that there was no information regarding the reliability of the witnesses' information, and that Roper was unlikely to be the only person with the street name of "Blue." The Government counters that the officers' knowledge of the nickname "Blue" along with Roper's match to the physical description given by witnesses is enough to establish probable cause.

Under the Fourth Amendment, unless an exception applies, a warrantless arrest requires probable cause. *Michigan v. Summers*, 452 U.S. 692, 700 (1981). Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested. *Beck v. Ohio*, 379 U.S. 89, 91 (1964). Alternatively, the Ninth Circuit has defined probable cause whether "under the totality of circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the

defendant] had committed a crime." *United States v. Smith*, 790 F.2d 789, 792 (9th Cir. 1986). While conclusive evidence of guilt is of course not necessary under this standard to establish probable cause, "[m]ere suspicion, common rumor, or even strong reason to suspect are not enough." *McKenzie v. Lamb*, 738 F.2d 1005, 1008 (9th Cir. 1984) (citations omitted).

The officers here had more than mere suspicion based on a physical description. "[M]ere resemblance to a general description is not enough to establish probable cause." *Grant v. City of Long Beach*, 315 F.3d 1081, 1088 (9th Cir. 2002). Regardless of whether there was another "Blue" in the area, it is unlikely that the other "Blue" matched the suspect's physical description given by Ross and the 911 callers. And it is even more unlikely that he was associated with a black Lincoln and was in that vehicle shortly after the shots were fired. Additionally, there is no reason to challenge the credibility of Ross or the other eyewitnesses. An officer contacted Ross personally and would have been able to evaluate her credibility as an informant, and there is no indication that she had any motive to not tell the truth.

Finally, Roper describes the officer's recollection that he knew the man described in the tip as "conjecture." This argument is belied by the fact that the officer went to the correct address and located a man who does go by "Blue" who was in a black Lincoln—all corroborating the information from the eyewitnesses. This is good police work, not conjecture. Based on the totality of the circumstances, the officers had specific facts provided by eyewitnesses that led them to the conclusion that there was a "fair probability" that Roper had committed a crime. Thus, regardless of whether the initial seizure occurred when Roper was in the car or after he broke his cell phone in the driveway, the initial stop was supported by

probable cause.[2] Therefore, Roper's Motion to Suppress and Dismiss for Lack of Probable Cause [Dkt. #50] is **DENIED**.

### B. Dkt. #27: Suppression of Evidence from Search Warrants

#### a. The M Street Warrant

Roper also moves to suppress evidence found during the execution of a search warrant at the two residences on M Street because police did not have probable cause to search either location. The Government correctly notes that Roper lacks standing to challenge the searches of either location. "Fourth Amendment rights cannot be asserted vicariously." *United States v. Silva*, 247 F.3d 1051, 1055 (9th Cir. 2001). Roper must show that he had a "legitimate expectation of privacy" in the property searched. *Id*. "The reasonableness of an expectation of privacy is evaluated 'either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'" *Id*. at 1055 (quoting *Rakas v. Illinois*, 439 U.S. 128, 143 n.12 (1978). Roper's uncle lived at the 3614 residence, and his grandmother lived at the 3610 residence. Both said that Roper did not live at either M Street residence. Roper cannot establish that he had a reasonable expectation of privacy when he did not live at either residence and he was not an overnight guest the night before the shooting. *See Minnesota v. Olson*, 495 U.S. 91, 98-99 (1990) (recognizing an overnight guest's legitimate expectation of privacy in the host's home). Roper cannot establish that he had a reasonable expectation of privacy in either M Street residence.

---

[2] Even under Roper's theory, that officers lacked probable cause for the initial stop and detention, there was certainly reasonable suspicion based on the eyewitness accounts and nickname "Blue" to justify the investigative stop. That stop was diligently conducted. Officers brought witnesses to the scene to identify Roper and the Lincoln, and Roper himself admitted to being at the scene of the incident. At that point, probable cause was present, and the officers arrested Roper. *See United States v. Mayo*, 394 F.3d 1271 (9th Cir. 2005) (upholding as reasonable a 40-minute *Terry* detention because officers promptly followed up on their grounds for suspicion).

**b.  The 56th Street Warrant and Motorcycle Warrant**

Roper also argues for suppression of evidence found during the execution of the the 56th Street and Motorcycle Warrants because the warrants are invalid for lack of probable cause. Alternatively, he argues that the search of the 56th Street residence exceeded the scope of the warrant.  The Government argues that probable cause exists, the search was within the scope of the warrant, and even if invalid, the evidence falls under the good faith exception to the exclusionary rule.  The Motorcycle Warrant's validity depends on the validity of the 56th Street Warrant because the Motorcycle Warrant was based on evidence discovered during the execution of the 56th Street Warrant as well as the alert by the police dog.

*1. Probable Cause*

The "validity of a search warrant depends on the sufficiency of what is found within the four corners of the underlying affidavit." *United States v. Taylor*, 716 F.2d 701, 705 (9th Cir. 1983).  The affidavit must establish probable cause to believe that contraband or evidence will be found at the place to be searched.  Fed. R. Crim P. 41.  Probable cause to search exists when, considering the "totality of the circumstances," an issuing judge can reasonably conclude that there is a "fair probability that contraband or evidence of a crime will be found at a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  The issuing judge's finding of probable cause is entitled to great deference. *United States v. Terry*, 911 F.2d 272, 275 (9th Cir. 1990). The affidavit need only establish "a reasonable nexus between the activities supporting probable cause and the locations to be searched." *United States v. Ocampo*, 937 F.2d 485, 490 (9th Cir. 1991).  "In making this determination, the [issuing judge] may rely on the conclusions of experienced police officers regarding where evidence is likely to be found." *Id*.

Here, the affidavit set forth specific and corroborated facts that easily support the Pierce County Judge's finding of probable cause for the 56th Street Warrant.  The affidavit included

information from Gipson, Roper's girlfriend, that she observed guns, currency, and cocaine inside the residence earlier that morning. Officers interviewed her face to face and had the opportunity to assess her credibility; she was not some anonymous informant. *See United States v. Rowland*, 464 F.3d 899, 907 (9th Cir. 2004) ("[A] known informant's tip is thought to be more reliable than an anonymous informant's tip."). The self-incriminating nature of her statements only added to her credibility. Based on the totality of the circumstances, the 56th Street Warrant was supported by probable cause. Similarly, the Motorcycle Warrant, which covered the motorcycle in the attached garage, was supported by probable cause.[3]

*2. Scope*

Roper argues that the seizure of miscellaneous documents, the alprazolam pills, and the prescription pill bottle exceeded the scope of the warrant and must be suppressed. He argues that, unlike the M Street Warrant, which allowed officers to search for "indicia of occupancy" concerning Roper, the 56th Street Warrant only allowed the seizure of papers with information regarding "names, addresses, and/or telephone numbers of co-conspirators," not papers related to Roper. Also, the warrant authorized officers to search for cocaine but not for other substances.

As the Government argues, Roper was a co-conspirator, and papers associated with him that were seized are thus within the scope of the warrant. The pills and pill bottle were seized under the plain view exception.

Roper's Motion to Suppress Evidence Seized During Execution of Search Warrants [Dkt. #27] is **DENIED**.

---

[3] As the Government notes, even if the warrants are invalidated, the exclusionary rule is not an available remedy when officers rely on warrants in good faith, and nothing here suggests that officers could not (or did not) rely on the warrants in good faith. *U.S. v. Leon*, 468 U.S. 897 (1984).

**D. Dkt. #51: Nexus Between Guns and Drugs**

Roper next argues that the nexus between the guns and drugs is insufficient to support Count 5, Possession of Firearms in Furtherance of Drug Trafficking. To prove a violation of 18 U.S. C. § 924(c)(1)(A), the government must prove: (1) that Roper intended to sell drugs; (2) that he possessed one or more firearms; and (3) that his possession was in furtherance of his intent to sell cocaine. "Mere possession" is not enough. *U.S. v. Rios*, 449 F.3d 1009, 1012 (9th Cir. 2006). Nor is mere occupancy in a residence where weapons were found. *U.S. v. Ruiz,* 462 F.3d 1082, 1088 (9th Cir. 2006) (overturning conviction when weapons were in a shared residence, but "no witnesses linked the firearms to either Defendant"). "[T]he government must show that the defendant intended to use the firearm to promote or facilitate the drug crime." *Id*. "[Relevant factors include] the proximity, accessibility, and strategic location of the firearms in relation to the locus of drug activities." *Id*.

Here, the Government alleges much more than "mere possession." Roper himself admitted that the argument with Black was over about drugs. Other witnesses said Roper fired a gun, and Gipson told officers that they left the gun at Roper's uncle's house. A ballistics test matched the Uzi found in his uncle's garage to the gun that was fired at the scene. The evidence that Roper fired the Uzi during what he admitted was an argument about drugs easily establishes the required nexus between the guns and drugs.

The other two weapons also satisfy the nexus requirement. The SKS rifle was found in a room with a pill bottle and letter addressed to Roper, along with a digital scale with possible cocaine residue on it. The 9mm pistol was in the garage, where cocaine was found in the motorcycle. Over $3,000 in currency from alleged drug transactions was found in the kitchen freezer. Together these facts are more than mere possession. They show that the guns were

accessible and strategically located near the items alleged to be used in the drug trafficking—the digital scale with white residue, cocaine in the motorcycle, and currency in the freezer.

Roper's Motion to Dismiss for Lack of Nexus Between the Guns and Drugs [Dkt. #51] is **DENIED**.

### E. Dkt. #52: Suppress Statements Based on Rule 5 Violation

Finally, Roper argues that Fed. R. Crim. P. 5 was violated when he was held in state custody because the same person was both the federal and state prosecutor and knew that he was going to bring federal charges. He argues that statements made in jail phone calls between the time he was arrested and the time he was transferred to federal custody should be suppressed. The Government argues that Rule 5 was not violated because Roper was arrested by local officers on state charges with no assistance from federal authorities, and that Rule 5 did not apply until the federal charges were filed.

Roper essentially argues that the long period of time between his arrest on state charges and the filing of federal charges violated his right to be taken "without unnecessary delay before a magistrate judge." Fed. R. Crim. P. 5(a). Still, Rule 5 "has no application where a defendant is in state custody, and federal officers did not participate in the arrest, detention or search." *Ward v. U.S.*, 388 F.2d 371, 372 (9th Cir. 1968). The purpose of Rule 5 is to protect against coercion. *U.S. v. Smith*, 321 F.R.D. 553, 558 (D.D.C. 1962). And although a working relationship between state and federal law enforcement officers can sometimes invoke constructive federal custody, Roper has not indicated any government plan to deny him of his rights, coerce him, or otherwise avoid its Rule 5 obligations. *See U.S. v. Rose*, 415 F.2d 742, 743 (6th Cir. 1969) (The burden is on the defendant to establish a "working arrangement between federal and state authorities designed to circumvent [the defendant's] rights under Rule 5(a).").

1  Roper cannot meet his burden. The best Roper can offer is that the prosecutor, after
2  determining federal charges would be filed, held Roper in state custody hoping that he would
3  make incriminating statements in recorded conversations with family and friends. This is hardly
4  coercion. The statements Roper seeks to suppress were not made to law enforcement, state,
5  federal, or otherwise—they were made to his family and friends. As the Government puts it, if
6  anything, Roper was given "too much freedom." The simple fact that the same person was both
7  the state and federal prosecutor, without more, does not establish that the Government intended
8  to circumvent Rule 5 and coerce Roper. Because there is no Rule 5 violation, Roper's Motion
9  Pursuant to Rule 5 to Suppress Evidence is **DENIED**.

### III. CONCLUSION

Roper's Motion to Suppress and Dismiss for Lack of Probable Cause [Dkt. # 50], Motion to Suppress Evidence Seized During Execution of Search Warrants [Dkt. #27], Motion to Dismiss for Lack of Nexus Between the Guns and Drugs [Dkt. #51], and Motion Pursuant to Fed. R. Crim. P. 5 to Suppress Evidence [Dkt. #52] are all **DENIED**.

IT IS SO ORDERED.

DATED this 6th day of December, 2012

Ronald B. Leighton
United States District Judge